Monnat & Spurrier, Chartered
200 West Douglas, Suite 830
Olive W. Garvey Building
Wichita, Kansas 67202
Telephone: (316) 264-2800
Facsimile: (316) 264-4785

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 19-10096-JWB |
| | ) | |
| MICHAEL P. OHRT, | ) | |
| Defendant. | ) | |
| | ) | |

**MOTION IN SUPPORT OF JOINT RECOMMENDATION FOR 90 MONTHS
INCARCERATION PURSUANT TO PLEA AGREEMENT UNDER FED. RULE
CRIM. PRO. 11(c)(1)(C) AND SENTENCING MEMORANDUM
IN SUPPORT THEREOF[1]**

COMES NOW the defendant, Michael P. Ohrt, by and through his attorney of

record, Sal Intagliata of Monnat & Spurrier, Chartered, and respectfully moves this Court

for an Order imposing a sentence of 90 months imprisonment for Mr. Ohrt pursuant to

the plea agreement negotiated and executed pursuant to Fed. Rule Crim. Pro. 11(c)(1)(C)

for the following reasons. Both the United States and Mr. Ohrt jointly recommend a

sentence of 90 months in prison: it brings finality to the sentencing process; it assures Mr.

Ohrt and the government will receive the benefit of the bargain they have struck; and it

serves the interest of justice. Mr. Ohrt lacks criminal history. The act is aberrant. His

---

[1] Counsel for Mr. Michael Ohrt served a Sentencing Booklet to the Court, the United States, and the US Probation Office on February 12, 2020. Counsel incorporates into this motion/memorandum the full content of that Sentencing Booklet by reference.

rehabilitative efforts and full and early acceptance of responsibility also are extraordinary. Under the specific circumstances of Mr. Ohrt's case, counsel respectfully submits, and the United States agrees, that a 90-month sentence most comports with the statutory objectives of 18 U.S.C. § 3553(a).

Mr. Ohrt further asserts that the section of the United States Sentencing Guidelines Manual applicable to his case, USSG §2G2.2, is flawed and excessively harsh; when the seriousness of the offense and the public's interest is properly counterbalanced against Mr. Ohrt's personal characteristics, including service to his community, both professionally and personally, service to his church, and the aberrant nature of this offense, anything over the jointly recommended sentence of 90 months incarceration would be "greater than necessary" to serve the mandated sentencing goals set forth under § 3553(a).

## INTRODUCTION

*It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.*

—***Koon v. United States***, 518 U.S. 81, 113 (1996) [2]

As a preliminary matter, a plea agreement conducted under Rule 11(c)(1)(C) binds the Court if and once the Court accepts the plea agreement. In determining the appropriate sentence, a district court "shall consider . . . the kinds of sentence and the

_____

[2]*See also **United States v. Huckins***, 529 F.3d 1312, 1319 (10th Cir. 2008) (same) (quoting ***Gall v. United States***, 552 U.S. 38 (2007) (internal quotations omitted).

2

sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines." 18 U.S.C. § 3553(a)(4)(A). And yet, while this Court must still correctly calculate the guideline range, it may not treat that range as mandatory or presumptive, but rather only "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a). *Gall v. United States*, 552 U.S. 38, 49, 51 (2007); *Kimbrough v United States*, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors" to "make an individualized assessment based on the facts presented," and explain how the facts relate to the purposes of sentencing. *Gall*, 552 U.S. at 53-60; *Pepper v. United States,* 131 S. Ct. 1229, 1242-43 (2011). The Court's overarching duty is to impose a sentence sufficient, but not greater than necessary to accomplish the sentencing goals set forth by statute. *Pepper*, 131 S. Ct. at 1242-43 (§ 3553(a)).

In this case, the 90-month sentence being jointly recommended is the appropriate disposition of the case. It brings certainty to the sentencing process. It assures that the defendant and the government will benefit from the bargain they have struck. It serves the interest of justice. And it assures a sentence consistent with the sentencing factors of 18 U.S.C. § 3553(a). Paragraph 4 of the Plea Agreement states:

> The Parties are of the belief that the proposed sentence does not offend the advisory sentencing guidelines. Because this proposed sentence is sought pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the parties are not requesting imposition of an advisory guideline sentence.

See: Plea Agreement; ¶4; page 3.

Any sentence imposed must properly and sufficiently punish Mr. Ohrt's offense but involve no greater deprivation of liberty than is reasonably necessary to implement Congress's statutorily-mandated sentencing goals. As will be set forth *infra* and at Mr. Ohrt's sentencing hearing, the factors and circumstances presented in Mr. Ohrt's case call for 90 months incarceration.

Both parties respectfully asks that this Court accept Mr. Ohrt's guilty plea pursuant to Rule 11(c)(1)(C) and that it exercise its discretion by accepting the plea agreement entered into under Rule 11(c)(1)(C) and imposing a sentence of 90 months (with credit for time served), followed by 5 years of supervised release and registration for life. Both parties respectfully assert that this sentence is "sufficient, but not greater than necessary" to serve the sentencing purposes under § 3553(a).

## SENTENCING GUIDELINES CALCULATIONS

The total offense level calculated for Mr. Ohrt by the United States Probation Office was 32, including a 3-level decrease for acceptance of responsibility. (PSR: ¶ 44; page 9). He had one (1) criminal history point for a misdemeanor offense of driving while intoxicated in 2007, but he remained in Criminal History Category I, thereby calling for suggested sentencing guidelines range of 121-151 months. Both Mr. Ohrt and the United States Attorney's Office recommend a variance to 90 months incarceration, as any sentence of incarceration greater than 90 months under these circumstances would be greater than necessary to accomplish the objectives of 18 U.S.C. § 3553(a). The variance calls for a reduction of 31 months from the low end of the guideline range, hardly excessive, and appropriate for the reasons asserted by the parties.

## ARGUMENT AND AUTHORITIES

I.   **The Court should accept the Plea Agreement made jointly by both parties, pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, and sentence Mr. Ohrt to 90 months incarceration.**

The parties have entered into a binding plea agreement pursuant to Rule 11(c)(1)(C) calling for a sentence of 90 months in prison. As previously stated, the parties jointly assert that sentence of 90 months incarceration, "does not offend the advisory sentencing guidelines. Because this proposed sentence is sought pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the parties are not requesting imposition of an advisory guideline sentence." (Plea Agreement; ¶4; page 3) The jointly recommended sentence is consistent with the Court's overarching duty to impose a sentence sufficient, but not greater than necessary to accomplish the sentencing goals set forth by 18 U.S.C. § 3553(a). *Pepper v. United States*, 131 S. Ct. 1229, 1242-43 (2011). As the Plea Agreement States:

> The parties seek this binding plea agreement as an appropriate disposition of the case, because if the Court permits itself to be bound by the proposed sentence, it brings certainty to the sentencing process; it assures that the defendant and the government will benefit from the bargain they have struck; it serves the interests of justice; and it assures a sentence consistent with the sentencing factors of 18 U.S.C. § 3553(a).

(Plea Agreement: ¶3; page 2)

Specifically:

> Mr. Ohrt represents to the Court, and the government agrees, that the government's evidentiary presentation at trial would have been more complicated than typical, and would have required more time and resources in the presentation. Thus, Mr. Ohrt's agreement to accept responsibility saved the government (and the Court) from the rigors of that more-than-typical presentation. For this reason, among others, the parties have agreed to jointly recommend…

(Email Exchange with AUSA Jason Hart; January 8, 2020.)

Though Mr. Ohrt does not represent that the United States would have been unsuccessful in proving its case at trial, the parties represent in good faith that the evidentiary presentation at trial, "would have been more complicated than typical," which, in turn, would have required considerable effort on the part of the United States to overcome. Mr. Ohrt's willingness to forego litigation and enter into this plea agreement in order to fully accept responsibility in this case brings certainty to the case, certainty to the sentencing process, and a benefit to both parties. It serves the interests of justice and the interests of the victims. It saves time and resources for the Court, the parties, law enforcement, other witnesses, and the victims, and it brings a sentence consistent with 18 U.S.C. § 3553(a).

It bears highlighting that Mr. Ohrt, though released on bond at the onset of litigation, voluntarily surrendered himself within days of release to demonstrate his full acceptance of responsibility to the government and his earnest willingness to resolve this case by plea.

## II.    Mr. Ohrt is criminal history category I.

Mr. Ohrt's only prior conviction is for driving under the influence of alcohol from 2007 for which he served three days in jail. He received one point and remained at criminal history category I. Mr. Ohrt has no other criminal history. He has never previously been charged with a felony, sex offense, or crime of violence.

**III.** **Given the nature and circumstances of Mr. Ohrt's offense, as well as his history and characteristics, the sentence requested is sufficient, but not greater than necessary to satisfy the purposes of sentencing, promote respect for the law, afford adequate deterrence, and avoid unwarranted sentencing disparities.**

For a sentence to be just, it must fit not only the crime but also the offender. *United States v. Huckins*, 529 F.3d 1312, 1316 (10th Cir. 2008). There is no question that the nature of Mr. Ohrt's conviction is serious. The mitigating facts and circumstances unique only to Mr. Ohrt distinguish Mr. Ohrt's culpability from others charged with these same offenses and sentenced under USSG §2G2.2. In this case, there are numerous mitigating factors which, when taken as a whole, support the conclusion that a 90-month term of imprisonment with five years of supervised release and a lifetime sex-offender-registration requirement, is sufficient, but not greater than necessary to fulfill the goals of 18 U.S.C. § 3553(a).

A.    *Mike Ohrt's history and characteristics*

Mike Ohrt has always served others and the public interest. From his youth, after his baptism in 1989, Mike gave of himself to his Church and to his congregation, first with Pleasantview Baptist Church. His faith led him to give to others. For example, Mike participated in a church mission trip to Teec Nos Pos, Arizona, in 1995, while in high school. He also served the public. He served as a page for State Representative Ted Powers in 1994 while in seventh grade. He served his junior high and high schools by serving on student council. Mike was named the "Hugh O'Brien Youth Award" recipient in 1995, allowing him to participate in summer leadership training. He was in tenth grade

7

(sophomore) at the time. He began work at Dillon's at 16 and continued to work through college.

Mike's interest in serving the public continued after he graduated from Mulvane High School in 1998. He received his bachelor's degree in Public Administration from Washburn University in 2002 and his master's degree in Public Administration from the University of Kansas in 2004. He worked as a lobbyist while in college.

After receiving his master's degree, Mike served various municipalities in various positions: Personnel Specialist; Customer Service Manager; Court Administrator; City Manager; and City Administrator. (See: Resume, Section 5 of Sentencing Booklet, incorporated by reference.) While doing so, Mike continued to volunteer within the communities he served. For example, he volunteered for Classic Movies in Reagan Park, Palestine, Texas. He was a Palestine YMCA Under-six soccer coach.

Mike continued with his faith. He became a member of Grace First Assembly of God in Fredonia, Kansas, when he took a position there as City Administrator Pastor Ray Pile states:

> It wasn't long before he [Mike] was more than an "attender" and became involved in the church as a volunteer. He offered to be one of the sound technicians. . . . He also eventually helped as a video technician.
>
> There are two things that quickly became evident. First of all was his faithfulness. When he was scheduled to help out, he was always there. . . . The second is the heart with which he performed his duties. Mike has the heart of a servant. He was willing to do whatever needed to be done.
>
> . . . . He was an asset to our church that is still missed.

8

Mike is also a family man. Mike met his wife, Brandy Wilson, while working in Palestine, Texas, in 2007. She had a two-year-old son, also named Michael. They fell in love—all three of them. Mike and Brandy married in 2009, and Mike adopted Michael a few months later. Though the three of them would love each other greatly for the time they were together, unfortunately, Brandy passed on July 28, 2015, in the home with little Michael there, while Mike was on a job interview about an hour away. Brandy had previously suffered serious health issues arising from her diabetes. She was 32 years old. Their son, Michael, was nine at the time. Brandy's passing was hard on both Mike and Michael. Mr. Paul Ohrt, Mike's father, puts it this way:

> . . . .
>
> Just think of the impact Brandy's passing has also had on Michael P. [Mike], losing your wife, companion and soul mate at a relatively young age. I am reminded of "you don't know what another person is going through, unless you have gone through that same situation yourself". [sic.] So, since Brandy's passing Michael has raised Michael J [their son] on his own. He was father, mother, grief counselor, money provider, meal provider, homework helper, went to school activities plus working full time.

Mike continued to raise his child until June 21, 2017, when Michael was removed from the home. Even then, after it was agreed that Michael would stay with Mike's sister and brother-in-law in Mulvane, Mike would drive from Fredonia to Mulvane every weekend to see Michael.

The character letters written on Mike's behalf and submitted to this Court on February 12, 2020, as a part of a Sentencing Booklet, underscore the fact that Mike is much more than this case. He is a loving brother raised in a loving home. He has always sought to serve his family, his Faith, and his fellow man/woman. Those letters are replete

9

with examples of him doing for others, on behalf of others, for the sake of others. According to his mother, Mrs. Linda Ohrt, Mike has recited the Pledge of Allegiance since he was three. According to his younger sister, Ms. Rachel Johnson, Mike has always looked out for her. He has always stepped up to serve his congregation and his Faith. Mike's uncle, Mr. Jim Ohrt, combines Mike's service to others with his love for Brandy and Michael:

> When Mike married the love of his life, Brandy, we nociied [sic.] how complete his life became as he shared his love and time with Brandy and son Michael. Mike's love, respect and concern for others was exhibited during this time as he totally embraced Brandy's son Michael and supported her through numerous health issues.

Mr. Jim Ohrt continues, discussing how the passing of Mike's wife took a toll on him:

> Atfter [sic.] Brandy passed away in July, 2015, it took a toll on Mike as his dreams and hope for the future with Brandy came to an end. He not only was coping with Brandy's death but raising a son who was also hurting after losing his mother. At this point in time, my wife and I continually prayed for Mike, as we realized how heartbroken he was during this time of coping with the death of his wife.

These character letters attest to who Mike is—much more than what his crime constitutes, but they, like the government and Mr. Mike Ohrt himself (as demonstrated by his voluntary surrender at the onset of this case after release on bond and this plea resolution), recognize that there is a consequence for this action. The parties call for 90 months incarceration. The character letters do not expect less, and 90 months satisfies 18 USC § 3553(a).

B.      Extraordinary Efforts at Rehabilitation Though full Acceptance of Responsibility

Mike's extraordinary efforts at rehabilitation are also noted in those character letters. It bears repeating that though Mike was ordered released on bond on June 28, 2019, on his motion, filed on July 3, 2019, he voluntarily requested that the bond be vacated and that he be allowed to surrender himself back into the custody of the United States Marshal's Office pending a resolution of his case. Mike's actions demonstrated his extraordinary start toward a full and complete acceptance of responsibility, thereby simultaneously starting his extraordinary rehabilitation. Mike's actions are in the minority. He received bond but quickly chose to decline it in furtherance of his goals of fully accepting responsibility by resolving his case by plea agreement. Mike directed and authorized that plea negotiations be undertaken, and as this Court confirmed during his plea hearing on November 6, 2019, it was Mike's decision to enter his guilty plea pursuant to the negotiated plea agreement—his alone: freely, voluntarily, and with understanding.

In addition, though Mike was not charged until June 18, 2019, when his son, Michael, was initially removed from the home by the Department of Children and Families (DCF) in June 2017, though no abuse to Michael took place, Mike did not contest the removal, as was his right. He instead thought it most appropriate to allow Michael to move in with Mike's sister and brother-in-law so as to provide Michael with a head start in adjusting to life if and when charges were formally filed.

11

Consider this: *Mike was not charged until June 18, 2019, but in service of the best interests of his son, Michael, he had Michael move in with his sister and brother-in-law in June 2017—two years prior to charging*. During that time, Mike visited Michael religiously.

The Report of Psychological Evaluation by Dr. Mitchell Flesher, part of the Sentencing Booklet, also further supports Mike Ohrt's rehabilitative efforts. Mike voluntarily submitted to a psychological evaluation on December 18, 2019, while in custody at the Butler County Jail. According to Dr. Flesher, "He was cooperative throughout the interview and evaluation, and he responded with adequate effort to all tasks." (**Behavioral Observations**; page 1.) All testing was valid. As noted by Dr. Flesher in the Summary and Recommendations section on page 7:

> Statistical risk studies indicate a very low probability of recidivism (five percent or less) for internet sexual offenders with no history of contact offenses, and there is no indication of aggravating factors that would significantly increase that risk, such including psychopathy, stable dynamic, acute risk factors, behaviors correlated to admitted sexual interest in children, or risk factors specific to child pornography offenders.

Dr. Flesher continues:

> Incapacitation of an online sexual offender such as Mr. Ohrt requires only strict monitoring or prohibition of Internet use rather than removal from society. Rehabilitation of an Internet offender involves mental health treatment of the underlying emotional factors that led to utilization of online sexual materials as well as development of individualized relapse prevention techniques, both of which can easily be accomplished on an outpatient basis. Mitigating factors associated with Mr. Ohrt and his case include the non-contact nature of the offense, his productive employment history, his cooperation with law enforcement, the absence of any significant criminal history, and absence of persistent mental health concerns that promote emotional or behavioral instability. Mr. Ohrt suffered the loss of his wife of six years in 2015, and that event triggered significant alcohol abuse and an extended period of grief and bereavement, and he

would benefit from individual cognitive behavioral counseling to assist in processing that event and developing coping skills for dealing with depression, stress, and other negative emotion. He also identified behaviors and characteristics suggestive of alcohol dependence, and it would be helpful for the counseling service to include an emphasis on recovery and relapse prevention.

Dr. Flesher endorses strict monitoring or prohibition of internet use for offenders such as Mr. Ohrt, "rather than removal from society." He also endorses treatment, both mental health treatment to develop individualized relapse prevention techniques and counseling against any alcohol relapse prevention.

C.    Aberrant Behavior:

Part and parcel with Mike's rehabilitative efforts and acceptance of responsibility comes the aberrant nature of the offense. Dr. Flesher finds no characteristics associated with the construct of psychopathy.  (Evaluation; page 5.) Then, on page 7, Dr. Flesher finds:

In contrast to previous decades in which child pornography was seen as effortful to come by, the relatively unregulated nature of the Internet makes such images readily available. As the Internet has become more available to a larger group of people and has facilitated access to child pornography, it is now more likely that people who appear similar to the general population and do not exhibit the psychological vulnerabilities displayed by other sexual offenders become convicted. A number of clinical studies have indicated that many offenders convicted of downloading child pornography appear to have no prior history of sexual interest, fantasies, or behaviors in relation to children. **It is noted that Mr. Ohrt falls into a category of Internet offenders that has been labeled the "discovery user" (Delmonico and Griffin, 2001).  This group includes those who never had any problems with sexual fantasy or behavior outside of Internet usage.** He suggested that his use of pornography was related to depression, which would be consistent with the origin of child pornography use by many non-contact offenders.

[Emphasis added.]

13

Mr. Ohrt is not perfect, and no one would venture such an assertion; but he has fully accepted responsibility for his actions: during his precharge rehabilitation; and in resolving this case. Mike has lived a life of faith and charitable service within his church and has made it his life's profession to work for communities. When able to return to his family, his church, and his community, Mike will continue that service and apply the lessons he has already learned and will continue to learn as a result of his conviction and sentence.

IV.    **Mr. Ohrt's Offense Characteristics and the Sentencing Guidelines**

This Court should also consider the specific facts of Mike's offense and recognize the differences between his offense and the more typical child pornography offense. The sentencing guideline enhancements identified in the Presentence Report as applying in Mike's case do not work to make a meaningful distinction between Mike and other, more culpable offenders.

A.    USSG § 2G2.2(7)

First, the image enhancement set out in USSG §2G2.2(7) is so outdated as to have been rendered meaningless. To put it simply, everything these days is video. If videos were treated like individual images, there would be a better distinction between the material found on Mr. Ohrt's computer and actual collections of child pornography seen in other cases. By placing such outsize value on videos, the material found on Mr. Ohrt's devices is placed in the same category as one that contains thousands of images or videos, potentially encompassing thousands of exploited children.

14

The enhancement as currently applied to video, in an era where everything is video, makes no distinction between an individual with 8 videos and one with 4000, carefully categorized and duplicated on a back-up of a hard drive. The image calculation is based on the allegation that 119 images and 9 videos were found on an Acer laptop computer and several were found on a Motorola Droid Turbo cell phone. (PSR ¶24; page 7; PSR ¶¶ 19 and 20; page 6). Each video on the laptop is treated as having 75 images. Therefore, the total "images" on the laptop equal 794: (9 videos x 75 = 675 images) + 119 images. In addition, there are several images on the cell phone referenced in the PSR.

The calculus for this enhancement is outdated, having been created in 2003. In those earlier days of the internet, video sharing was far less common than it is today after the birth of YouTube (in 2005) and the rise of software and social media platforms that make video a standard format for sharing on the internet. Even though we have entered an era where video is ubiquitous, the sentencing enhancement calculating how much material a defendant possessed presumes an outdated medium, still photographs, are the standard by which defendants should be judged.

The image calculation as applied to video no longer makes any meaningful distinction in offender culpability. The United States Sentencing Commission itself recognized the outdated nature of this enhancement over six years ago in its comprehensive 2012 Report to the Congress: Federal Child Pornography Offenses. *See* Report, pages 322-323, available at https://www.ussc.gov/research/congressional-reports/2012-report-congress-federal-child-pornography-offenses  (recommending the image calculation enhancement be altered to more accurately categorize offenders based

on collecting behavior). Mr. Ohrt would instead respectfully suggest his enhancement should be considered a 2-level enhancement for having a total of just over 128 images on his laptop and phone.

The enhancements separate offenders into only five categories: 1) offenders with fewer than 10 images, 2) between 10 and 150 images, 3) between 150 and 300 images, 4) between 300 and 600 images, and 5) 600+ images. While these categories genuinely distinguish large-scale collectors of child pornography images from lesser offenders, those distinctions are lost in the translation to video. An offender with only four videos is classified in the second-highest level of offender and only four more places an offender in the top offense level. USSG §2G2.2(7).

B.    **USSG §2G2.2(6)**

The application of a 2-level enhancement for the offense involving the use of a computer or an interactive computer service for the possession, receipt, or access with the intent to view the material also makes no meaningful distinction between Mr. Ohrt and every other offender. USSG § 2G2.2(b)(6). The use of a computer is present in virtually every child pornography case such that this fact is no longer a sentencing enhancement in a way that distinguishes one defendant's culpability from another's. As noted above, the sentencing enhancements were established over 15 years ago, before the era of smart phones and inexpensive laptops. In 2003, it may still have been reasonable to believe that not every offender would access material online rather than by now-outdated methods of publication. By 2017, though, when Mr. Ohrt's offense occurred, tracking child pornography networks online had become the standard method for federal authorities to

16

find offenders. Child pornography is an internet-based offense such that today, it would be the rarest of rare cases that did not involve a computer.

C.    **In its current form, §2G2.2 rests on congressional assumptions that are contrary to empirical evidence and commission action unsupported by empirical evidence or national expertise and results in a sentencing range that is greater than necessary to serve the purposes of sentencing or any other sound policy goal.**

As the Tenth Circuit recently clarified in *United States v. Grigsby*, 749 F.3d 908, 911 (10th Cir. 2014), even though the sentencing court shall consider the applicable guideline range, "[t]o be sure," a district court that disagrees with the child-pornography production guideline on policy grounds "may vary from the Guideline." *Id*. at 911 ("To be sure, district courts that disagree with § 2G2.2 may vary from the Guidelines.") (quoting *United States v. Ngheim*, 432 Fed. Appx. 753, 757 (10th Cir. 2011) (unpublished)); *see also United States v. Huckins*, 529 F.3d 1312, 1317 (10th Cir. 2008) ("Although sentences imposed within the correctly calculated Guidelines range may be presumed reasonable on appeal, sentences imposed outside the Guidelines range may not be presumed unreasonable.").

In truth, a key component of Supreme Court holdings, designed to ensure that the Guidelines are truly advisory and constitutional, is the authority of this Court to disagree with a guideline as a matter of policy. Because "the Guidelines are now advisory . . . , as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101-02 (2007) (internal punctuation omitted); citing *Rita v. United*

17

*States*, 551 U.S. 338, 351 (2007) (district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations"). As the Supreme Court held in *Kimbrough*, because "the cocaine Guidelines, like all other Guidelines, are advisory only," it "would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." 552 U.S. at 91, 109-10; *see also Spears v. United States*, 555 U.S. 261, 267 (2009) ("[D]istrict courts are entitled to vary from the crack cocaine Guidelines in a mine-run case where there are no 'particular circumstances' that would otherwise justify a variance from the Guidelines' sentencing range.").

Hence, Congressionally-directed guidelines are just as advisory as any other guideline and therefore equally subject to policy-based variances. In *Vazquez v. United States*, 130 S. Ct. 1135 (2010), the Supreme Court remanded for reconsideration in light of then-Solicitor General Kagan's position that "all guidelines," including congressionally-directed guidelines, "are advisory, and the very essence of an advisory guideline is that a sentencing court may, subject to appellate review for reasonableness, disagree with the guideline in imposing sentencing under § 3553(a)." U.S. Br. at 11, *Vazquez v. United States*, No. 09-5370 (Nov. 2009). "*[A]ll* of the sentencing guidelines are advisory," including those directed by Congress. *United States v. Michael*, 576 F.3d 323, 327 (6th Cir. 2009) (emphasis in original). Congressional directives "tell[] the Sentencing Commission, not the courts, what to do," and "a directive that the

18

Commission specify a particular Guidelines range is not a mandate that sentencing courts stay within it." *Id*. at 328.

This Court therefore may properly find that §2G2.2 was not developed by the Commission based on empirical data and national experience and, consistent with the Supreme Court's repeated recognition that when a guideline is not based on empirical data of past sentencing practices and national sentencing experience, it is likely that the guideline does not "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *See* ***Kimbrough v. United States***, 552 U.S. 85, 109-10 (2007). Accordingly, a court may afford less respect to the guideline by granting a policy-based variance from that would not be subject to "closer review" or be considered "suspect" by a reviewing court. *Id*.

In the last ten years, the sentencing guidelines governing child pornography offenses have come under careful scrutiny and faced substantial criticism for their basis in politics—that is, in the passions and inclinations of the mob—rather than soundly based upon data or expertise. In 2009, for example the Commission chronicled the federal non-production child pornography guidelines from their inceptions, placing emphasis on the changes in increased sentencing effected by the new mandatory statutory-minimums promulgated by the PROTECT Act. *See* U.S. Sent'g Comm'n, *History of the Child Pornography Guidelines* (Oct. 2009). The 2009 Report indicated there can be no doubt that Congress has significantly interfered with sentencing policy in this area such that the child-pornography guidelines are not the product of Commission studies or national expertise. *See, e.g.,* ***United States v. Dorvee***, 616 F.3d 174, 184-85

19

(2nd Cir. 2010) ("Sentencing Guidelines are typically developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices. However, the Commission did not use this empirical approach in formulating the Guidelines for child pornography. Instead, at the direction of Congress, the Sentencing Commission has amended the Guidelines . . . several times since their introduction in 1987, each time recommending harsher penalties. (citing U.S. Sent'g Comm'n, *History of the Child Pornography Guidelines* (Oct. 2009) (internal citation omitted)).

For example, in 2004, in response to the passage of the PROTECT Act, the Commission arbitrarily increased the guideline ranges in child pornography offenses in an effort to make them coterminous with the new mandatory minimum sentences meted out by Congress. *See* USSG, Appendix C, Amend. 664 ("[T]he amendment increases the base offense level of 2G2.1 . . . from level 27 to 32. A base offense level of 32 is appropriate for production offenses because combined with the application of several specific offense characteristics that are expected to apply in almost all production cases . . . this base offense level will ensure that the 15 year mandatory minimum . . . will be met.") Notably, after the Commission's arbitrary increase, the average prison sentences for offenders increased exponentially:

> Average prison sentence for production offenses increased from 63.5 months in 1992 to 153.4 months in 2004, the year after the PROTECT Act was enacted. As more offenders thereafter were subject to the increased penalty provisions in the PROTECT Act, sentences continued to increase, and by 2009 average sentences hit their high point (282.9).

2012 Report to Congress, *supra* at 253.

In 2012, the Commission expanded upon its 2009 research when it produced a comprehensive report to Congress examining child pornography offenses again, with an emphasis on non-production offenses. Report to Congress, *supra*. The Commission noted that it compiled the report in large part because of the increasing rate of below-guideline sentences imposed on individuals convicted in child pornography cases, and pursuant to the Commission's statutory duty "to consider whether the guidelines are in need of revision in light of feedback . . . reflected in [judges'] sentencing decisions." *Id*. at ii. Additionally, the commission noted the need to review the guidelines "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguish among offenders based on their degrees of culpability." *Id*. at ii., 323.

For example, both §2G2.1, the guideline addressing production of child pornography. and §2G2.2, the guideline at issue in Mr. Ohrt's case, contain the same specific enhancement for factors such as age of the minor involved in the offense, which are present in a large majority of child-pornography cases. The first 2-level specific-offense enhancement under §2G2.1 for conduct involving a minor under the age of 12 has warped since 1987 into either a 2- or 4-level increase depending on the age of the victim. USSG §2G2.1(b)(1)(A). The Commission recognized in its 2012 report that since 1996, "this enhancement has consistently applied in approximately 90 percent of [production] cases . . . ." 2012 Report to Congress, *supra* at 261; *see also* USSC, *Use of Guidelines and Specific Offense Characteristics: Offender Based* 41 of 81 (FY 2015)

(documenting that in FY 2015, the age-of-the-minor enhancement applied in over 90% of all §2G2.1 cases). The prevalence of the age-specific-offense-enhancement describes conduct that, because of its consistent application, is in essence inherent to the crime itself. Enhancements that apply in almost every case are thus contrary to the purpose of offense-specific enhancements—that is, sentencing enhancements that are meant to increase a sentence for a defendant's aggravating conduct.

Of course, the applicable section of the guideline—whether empirically based or not—remains one factor this Court must consider in reaching Mr. Ohrt's individualized sentence. *See United States v. Grigsby*, 749 F.3d 908, 911 (10th Cir. 2014). But, as the Tenth Circuit reiterated in *Grigsby*, even though the sentencing court shall consider the applicable guideline range, "[t]o be sure," a district court that disagrees with the guideline may vary from it. *Id*. at 911 ("To be sure, district courts that disagree with [the applicable guideline] may vary from the Guidelines.") (quoting *United States v. Ngheim*, 432 Fed. Appx. 753, 757 (10th Cir. 2011) (unpublished)); *see also United States v. Dorvee*, 616 F.3d 174, 188 (2nd Cir. 2010) ("District judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under 2G2.2—ones that can range from non-custodial sentences to the statutory maximum—bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results.").

It is the duty of sentencing courts to prevent injustices by the hand of the government. As Judge Weinstein cogently expressed, it is the court that "must decide: does this law violate the essence of my duty to self and humanity?" Jack B. Weinstein,

22

*Every Day Is A Good Day for a Judge to Lay Down His Professional Life for Justice*, 32 Fordham Urb. L. J. 131, 155 (2004). Here, an outside-of-the-guidelines sentence will respect the distinction between Mr. Ohrt's culpability and individual circumstances, *see infra*, and the draconian structure of USSG §2G2.2, which, as currently drafted, is driven by political persuasion and mob mentality rather than grounded in any scientific, statistical, or empirical method to balance the competing interests of sentencing.

**IV.    The sentence requested would sufficiently promote respect for the law and afford adequate deterrence in light of the seriousness of the offense.**

Whether to vary from the guideline range based on policy considerations is only one factor that a court must consider in fashioning a defendant's individualized sentence, and appellate courts owe due deference to a district court's decision to deviate from the guidelines based sentencing factors when considered as a whole. ***United States v. Huckins***, 529 F.3d 1312, 1317 (10th Cir. 2008) (acknowledging that the district court "has an unquestionable institutional advantage over an appellate court to consider whether the facts of an individual case justify a variance").

Advances in technology have rapidly changed the nature of child-pornography offenses. As noted above in discussing the image enhancement, the Sentencing Commission itself has acknowledged the guidelines have not kept up with the rapid changes in the nature of child pornography offenses as the internet has become the standard means of accessing pornography. In the past, child pornography had to be produced and obtained in a risky and secretive manner for substantial sums of money. Today, images of child pornography are easily produced and available for free in the

23

privacy of one's home, with no planning and minimal effort. As a result, less dangerous people commit child-pornography offenses than was previously the case, even though the guideline range is much higher than it was previously. In 1992, the government prosecuted only 10 cases for production. *See* 2012 Report to Congress, *supra* at 247. In 1994 and 1995, the government prosecuted a total of only 90 defendants convicted of possessing, receiving, or distributing child pornography, and only 24% used a computer. *See* U.S. Sent'g. Comm'n, *Report to the Congress: Sex Crimes Against Children* 29 (1996). In 2010, the government prosecuted 207 production cases, and in 2011 it prosecuted 1,645 defendants who were convicted of possessing, receiving, or distributing child pornography, where 97% of the 1,645 defendants used a computer. *See* 2012 Report to Congress, *supra* at 247; U.S. Sent'g. Comm'n, *Use of Guidelines and Specific Offense Characteristics* (2011); U.S. Sent'g. Comm'n, 2011 *Sourcebook of Federal Sentencing Statistics*, tbl. 17.

Hence, the internet and the ever-increasing prevalence of electronic devices has altered the very nature of child pornography offenses in a way the guidelines have not yet acknowledged. While it would now be the rare child pornography case that did not involve a computer, § 2G2.2(b)(6) still imposes a two-level "enhancement" for the use of a computer in the commission of the crime. An enhancement that applies to every offender, though, is not a true enhancement. The swift changes in—and access to—technology and electronic devices is relevant, in part, because it means that even as the population of child-pornography offenders has become less dangerous, punishment has steadily and greatly increased. In determining an appropriate and just sentence, this Court

24

must consider the sentence available by statute. 18 U.S.C. § 3553(a)(3). By taking an already inflated base-offense level and enhancing sentences based on factors that are inherent in the crime, §2G2.2 fails to provide any meaningful distinction between offenders, and thus fails to provide for proportionality in punishment among offenders and offenses of different seriousness and culpability. Under the circumstances unique to Mr. Ohrt and his crime of conviction, a sentence to the statutory minimum is the greatest sentence necessary to achieve the sentencing goals of § 3553(a).

It is also proper for this Court to consider the lasting, collateral effects of Mr. Ohrt's conviction requiring that he register as a sex-offender for what inevitably will be the rest of his life. *See, e.g., **United States v. Garate***, 543 F.3d 1026, 1028 (8th Cir. 2008) (holding that the district court correctly considered the collateral consequences of "the lasting effects of having to register as a sex offender"). The Tenth Circuit recently held that it is improper for a court to focus on collateral factors such as negative "publicity, loss of license, and deterioration of physical and financial health," in fashioning a sufficient sentence because these factors do not "reflect upon the seriousness of his offense," and because such factors "impermissibly favor criminals, like [the defendant], with privileged backgrounds." ***United States v. Morgan***, 635 Fed.Appx. 423 at *20 (10th Cir. 2015) (unpublished). But unlike the factors supported by the ***Morgan*** court's rationale, it is axiomatic that today's onerous federal and state sex-offender-registration schemes do "reflect upon the seriousness" of an offense and do not discriminate against any class of offenders, socio-economically or otherwise. Therefore, it is proper for this court to consider this collateral consequence of Mr. Ohrt's convictions.

Notably, the oft-touted argument underlying Congress's and the Commission's increased sentences for child-pornography offenders does not apply here—that is, the argument that increasing punishment for child pornography offenses will dry up the market and thereby reduce demand for the abuse of children in order to produce child pornography. 136 Cong. Rec. S4730 (Apr. 20, 1990) (Senator Thurmond). Congress relied on this same view when it directed the Commission to increase the base offense level in 1991. See 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) ("[W]e must increase the sentencing levels for child porn if we want to stop child molestations and put a dent in the child porn trade.").

Here, however, Mr. Ohrt did *not* expand the child-pornography market by producing any content. Furthermore, Congress was mistaken in its beliefs about the deterrent effect that increased sentencing would have on the child-pornography market. The production, trading, and viewing of child pornography takes place on a global stage that cannot be significantly impacted by severe penalties in the United States. Many countries do not have laws aimed at child pornography, and of those that do, many do not criminalize the possession of child pornography. John Carr, Commonwealth Internet Governance Forum, *A Joint Report on Online Child Protection Combatting Child Pornography on the Internet* 19 (2010). As a result, there is a large, international legal market for child pornography that exists whether Mr. Ohrt is incarcerated for one year or for 30. This market is not organized, but is mostly comprised of amateur collectors who can freely and easily obtain images, increasingly via peer-to-peer networks, *see* United Nations Office on Drugs and Crime, *The Globalization of Crime: A Transnational*

26

*Organized Crime Threat Assessment* 13 (2010), and thus does not operate by the ordinary rules of supply and demand. In this context, severe punishment of one whose offenses did not involve production or the commission of a sexual act will have little impact on the proliferation of child pornography in the world.

Furthermore, it is worth noting that Mr. Ohrt did not distribute any material. He received no enhancement under the guidelines for doing so. He transported child pornography; he did not distribute it, and he was never charged with distribution or production. While his offense is serious and he takes full responsibility for his actions, Mr. Ohrt is not a typical distributor of child pornography, either in scope or in purpose.

A.    *The need to avoid unwarranted sentencing disparities.*

The joint recommendation that Mr. Ohrt be sentenced to 90 months incarceration is also supported by the need to avoid unwarranted sentence disparities between individual offenders whose offense and characteristics are similar in ways relevant to sentencing. Under current law, sentencing courts must consider the sentencing practices of other courts. ***Kimbrough v. United States***, 552 U.S. 85, 108 (2007).

The guidelines give heavy weight to factors based on assumptions about the seriousness of the offense and general deterrence that are unfounded, and particularly in this case. Here, a sentence within the guidelines range would create the type of sentence disparity that violates § 3553(a)(6) given that it fails to take into account any of Mr. Ohrt's characteristics, which demonstrate that imprisoning him to more than 90 months is greater than necessary to fulfill Congress's sentencing goals. In this case, the variance is therefore necessary to avoid unwarranted uniformity between Mr. Ohrt's case and

27

dissimilar defendants who committed dissimilar, and far more egregious conduct. *See*

***Gall v. United States***, 552 U.S. 3, 55 (2007) (in imposing a sentence of probation, district

court appropriately "avoid[ed] unwarranted similarities").

Here, to say that a sentence greater than 90 months is "not greater than necessary,"

denotes that, despite all the mitigating factors that distinguish the nature of Mr. Ohrt's

character and lessen his culpability, society is not only unwilling to break the cycle of

retribution and suffering, but also that it is incapable of exercising its merciful discretion

in an effort to heal. *See* Bryan Stevenson, Just Mercy: A Story of Justice and Redemption

("The power of just mercy is that it belongs to the undeserving. It's when mercy is least

expected that it's most potent—strong enough to break the cycle of victimization and

victimhood, retribution and suffering. It has the power to heal the psychic harm and

injuries that lead to aggression and violence, abuse of power, and mass incarceration.").

By properly counterbalancing the nature of the offenses against Mr. Ohrt's

personal characteristics and individual circumstances, any sentence greater than 90 month

imprisonment, followed by a reasonable term of supervised release and lifetime offender

registration requirements, would be "greater than necessary" to serve the goals mandated

by § 3553(a). Mr. Ohrt has suffered and will continue to suffer substantial mental and

personal anguish over his conviction, and the consequences of that conviction on those he

loves, especially on his devoted parents, his son, and his sisters, but also his church, and

his community. As counsel and this Court know, each of us is—fortunately—more than

the worst things we have ever done. Mr. Ohrt's long history of charity, hard work, and

community service show the strength of his character and the likelihood that upon release

28

from custody, he will continue his efforts to find a career where he can help others. He accepts that he will receive just punishment for this serious crime, but just punishment should not be a sentence inflated by the whims and fears of the masses that has no basis in deterrence or reducing the already extremely low possibility of recidivism. A 90-month sentence of imprisonment imposed by this Court as recommended by both parties is sufficient but not greater than necessary under the circumstances unique to Mr. Ohrt's case to serve the sentencing goals of 18 U.S.C. § 3553(a).

## CONCLUSION

Rule 11(c)(1)(C) allows for a binding sentence of 90 months. Congress itself acknowledged in the Sentencing Reform Act, and as set forth in the *Guidelines Manual*, "it is difficult to prescribe a single set of guidelines that encompasses the broad range of human conduct potentially relevant to a sentencing decision." In light of all the factors of 18 U.S.C. § 3553(a), the jointly recommended sentence of 90 months followed by a reasonable term of supervised release and lifetime registration, and that Mr. Ohrt undergo any further treatment deemed necessary, is sufficient but no greater than necessary to serve the goals of Section 3553(a), and respectfully Mr. Ohrt requests that the Court sentence him to the jointly recommended sentence of 90 months. Mr. Ohrt also respectfully requests that the Court recommend placement in the Federal Bureau of Prisons at the Federal Correctional Institution, Seagoville, Texas.

RESPECTFULLY SUBMITTED,

s/ Sal Intagliata
SAL INTAGLIATA, #17217
Attorney for Defendant, Michael P. Ohrt

29

Monnat & Spurrier, Chartered
200 West Douglas, Suite 830
Wichita, Kansas 67202
(316) 264-2800
Fax (316) 264-4785
sal.intagliata@monnat.com

## CERTIFICATE OF SERVICE

I hereby certify that on **February 12, 2020**, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:

AUSA Jason Hart
Jason.Hart2@usdoj.gov

I further certify that I delivered the foregoing documents and the notice of electronic filing by other means to the following non-CM/ECF participants:

USPO Jeffrey Blessant                    EMAIL; and

Michael P. Ohrt                          U.S. Mail, First Class


s/ Sal Intagliata
SAL INTAGLIATA, #17217
Attorney for Defendant, Michael P. Ohrt